UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JANE M. TREWORGY, *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | 1:14-cv-00097-GZS |
| | ) | |
| MARY C. MAYHEW, *et als.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDED DECISION**

Plaintiffs Jane Treworgy and her son, John Treworgy, allege that the Commissioner of the Maine Department of Health and Human Services, the Commissioners of Penobscot County, the Penobscot County Register of Probate, and the Department's employee, Jodi Ingraham, violated the United States Constitution, the Maine Constitution, and the Maine Health-Care Decisions Act in connection with their action or inaction in guardianship proceedings involving the late Paul F. Treworgy. The matter is before the Court on Defendants Penobscot County Commissioners' and Susan Almy's Motion to Dismiss (County Defendants' Motion to Dismiss, ECF No. 8), and Defendant Mary C. Mayhew's Motion to Dismiss (Defendant Mayhew's Motion to Dismiss, ECF No. 11).[1] Following a review of the pleadings, and after consideration of the parties' arguments, as explained below, the recommendation is that the Court grant in part and deny in part the motions.

---

[1] The Court referred the motions for report and recommended decision.

## FACTUAL BACKGROUND

The facts set forth herein are derived from Plaintiffs' First Amended Complaint, which facts are deemed true when evaluating the Motion to Dismiss.[2] *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16 (1st Cir. 1998).

Plaintiffs Jane Treworgy and her son, John Treworgy (collectively, "Plaintiffs"), are residents of Bangor, Maine. Jane Treworgy is the personal representative of the Estate of Paul F. Treworgy, who was the husband of Jane Treworgy and the father of John Treworgy. (First Am. Compl. ¶¶ 1-2, ECF No. 7.) Defendant Mary C. Mayhew is the Commissioner of the Maine Department of Health and Human Services ("DHHS") and is being sued in both her official capacity and her individual capacity. Defendant Jodi Ingraham at all material times was an employee of the Maine Department of Health and Human Services and is being sued in her individual capacity. Defendants Penobscot County Commissioners Peter Baldacci, Tom Davis, and Laura Sanborn, are sued in their official capacities. Defendant Susan Almy is the Register of Probate for Penobscot County and is sued in her official capacity. (*Id.* ¶¶ 4-7.)

After residing in Florida for 32 years, Paul and Jane Treworgy returned to Bangor, Maine in April 2010 to be with their son, John. Between 2010 and his death on October 29, 2011, Paul Treworgy suffered from a number of medical conditions, including, but not limited to, prostate cancer, dementia, lower limb contracture, incontinence and immobility. (*Id.* ¶¶ 19-20.) Upon his return to Maine, Mr. Treworgy was periodically a patient at the following health care facilities:

- From May 10, 2010, to May 13, 2010: at St. Joseph Hospital in Bangor, Maine.
- From May 13, 2010, to July 12, 2010: at Bangor Nursing and Rehab Center.
- From March 15, 2011, to March 22, 2011: at St. Joseph Hospital.

---

[2] The reference to the facts as alleged should not be construed as a determination that the alleged facts are accurate. The alleged facts are recited in the context of the standard of review for a motion to dismiss.

- From March 22, 2011, to March 26, 2011: at the Maine Veteran's Home.

- From March 26, 2011, to March 30, 2011: at Eastern Maine Medical Center (EMMC).

- From March 30, 2011, to June 28, 2011: at Maine Veteran's Home.

(*Id.* ¶¶ 21, 25-28.)

On October 29, 2011, Mr. Treworgy died in a nursing home. According to Plaintiffs, Mr. Treworgy was in the nursing home against his wishes and the wishes of Jane Treworgy, whom Mr. Treworgy appointed to serve as his agent in an advance directive. (*Id.* ¶¶ 17, 22, 72.) In the advance directive, signed in the presence of two witnesses on June 19, 2010, Mr. Treworgy specified that he wanted Jane to serve as his guardian in the event of his incapacity. He also appointed his son, John, to be his alternative guardian. Mr. Treworgy also expressed a desire to be kept alive as long as possible within the limits of generally accepted health care standards, and also expressed his wish that he not receive morphine or other opiates unless he was in extreme pain. (*Id.* ¶¶ 22-24.)

On or about August 29, 2011, Jane Treworgy contacted EMMC to request home services and a health aid, noting that Mr. Treworgy was developing bed sores. Based on this request, EMMC contacted the Department's Office of Adult Protective Services ("APS") and asked that it perform a home evaluation. EMMC placed Jane Treworgy's application for services in a folder pending the APS evaluation, but did not provide Jane Treworgy with any prescriptions or supplies pending the evaluation. (*Id.* ¶¶ 29-31.)

On September 13, 2011, Jodi Ingraham visited the Treworgy home. (*Id.* ¶ 37.) Plaintiffs assert that they did not understand that Ms. Ingraham was with APS and that Ms. Ingraham did not identify herself as being with APS. (*Id.* ¶ 38.) Ms. Ingraham reported to EMMC that she believed that the family was "doing the best they can with limited resources," and that Mr.

3

Treworgy was "of sound mind to make the choice to stay in the home." (*Id.* ¶ 37.) On information and belief, Plaintiffs allege that the Department opened a file on Mr. Treworgy and ordered that it remain open for 90 days. (*Id.* ¶ 39.)

EMMC informed Jane Treworgy that a home-care visit was scheduled for September 20, 2011. Because she believed that Mr. Treworgy needed more immediate attention, Jane Treworgy arranged for Mr. Treworgy to be transported by ambulance to St. Joseph Hospital. (*Id.* ¶ 36.) At the time, Jane understood that Mr. Treworgy was suffering from a urinary tract infection, fever, and possible pneumonia. (*Id.* ¶ 41.) Before Mr. Treworgy's discharge from the hospital, Ms. Ingraham told Jane Treworgy that she worked for APS and that Mr. Treworgy had to go to a nursing home upon discharge. (*Id.* ¶¶ 44-46.) Although Plaintiffs had the resources to pay for home care and hospital stays, Jane agreed with the request, and began to consider various placements for Mr. Treworgy. (*Id.* ¶¶ 47-48.)

On September 28, Ms. Ingraham signed an Acceptance of Appointment by Public Guardian of Incapacitated Person ("Acceptance") and an Affidavit in Support of Temporary Public Appointment ("Affidavit"). (*Id.* ¶¶ 51-52.) Plaintiffs contend that the Affidavit contained numerous false, misleading, and damaging statements, including:

> (a) "Mrs. Treworgy had not had any help in the home for approximately three weeks because Mrs. Treworgy had refused PCA services because of the cost."
>
> (b) "[Mrs. Treworgy] also does not want to pay for nursing home care for her husband and will not hire a PCA to come into the home."
>
> (c) "The Department has worked with the family since 2010. During this time there have been many attempts to support this family's decision to care for Mr. Treworgy at home."
>
> (d) "In home services attempts have not been successful due to the lack of follow through and lack of understanding about the gravity of Mr. Treworgy's condition by the family."

4

(e) "His wife is unable to care for Mr. Treworgy in their home and has a history of refusing services and providing inadequate care to her husband."

(*Id.* ¶ 52.)

On September 29, 2011, the Department filed the Acceptance and Affidavit, a Petition for Appointment of Public Guardian ("Petition"), and a Physician's Report in the Penobscot County Probate Court. (*Id.* ¶ 57.) In its Petition, the Department sought the appointment of a temporary guardian on an emergency basis, represented that Mr. Treworgy lacked the resources to pay for counsel despite the fact that the Department knew or should have known that he had sufficient resources to retain counsel, and sought a guardian other than Jane Treworgy even though the Department knew that Mr. Treworgy nominated Jane or John Treworgy to serve as his guardian in his advance directive. (*Id.* ¶¶ 53, 54, 58.) Jane and John Treworgy did not receive copies of the filings until October 22, 2011. (*Id.* ¶ 59.)

On September 30, 2011, the Probate Court conducted a hearing on the Petition. The proceedings were not recorded. (*Id.* ¶¶ 60-61.) Although Plaintiffs were present, they had no opportunity to review the pleadings or to retain an attorney, and they were instructed not to speak during the hearing unless requested. (*Id.* ¶¶ 62-63.) Following the hearing, the Probate Court granted the Department custody of and the authority to make all medical decisions regarding Paul Treworgy. (*Id.* ¶ 65.) None of the Defendants provided Plaintiffs with notice of their right to appeal or to seek an expedited hearing. (*Id.* ¶ 66.) Although the Probate Court issued its written order on September 30, the Department transferred Paul Treworgy to Eastside Rehabilitation and Living Center on September 29. (*Id.* ¶ 64.)

During Paul Treworgy's stay at Eastside, Plaintiffs were permitted to visit and did so on many occasions, but they were not permitted to receive information about Paul Treworgy's care,

or to be alone with Mr. Treworgy. From their observation, Mr. Treworgy appeared to be drugged and in a "stupor," contrary to his advance directive. (*Id.* ¶¶ 67-68.)

On October 22, 2011, Plaintiffs received a General Notice of Beginning of a Formal Probate Proceeding that informed them of a final hearing set for November 4, 2011. (*Id.* ¶ 71.) However, Paul Treworgy died on October 29. (*Id.* ¶ 72.) The Department filed a motion to dismiss its Petition on November 2. Neither the Department nor the County notified the Plaintiffs of the motion. (*Id.* ¶¶ 73-74.) The Probate Court dismissed the case without notice. (*Id.* ¶ 75.)

On January 9, 2012, Jane Treworgy was appointed Personal Representative of the Estate of Paul Treworgy. (*Id.* ¶ 77.) In this capacity, she made repeated requests of the Department for records regarding Paul Treworgy. The Department refused her requests. (*Id.* ¶¶ 78-79.)

In this case, Plaintiffs allege that Defendants violated their constitutional rights and the constitutional rights of Paul Treworgy by (1) failing to provide adequate notice of the guardianship proceeding and its dismissal, (2) refusing to provide Plaintiffs with a record of proceedings, (3) maintaining a custom and/or practice of denying Maine citizens substantive and procedural due process, (4) scheduling "emergency hearings" on behalf of the Department when it is known that no emergency exists, (5) denying access to legal counsel, and (6) failing to make a record of proceedings and provide meaningful notice of the right to appeal from decisions. (*Id.* ¶¶ 89-97.)

Plaintiffs assert several counts arising under 42 U.S.C. § 1983: Count I, alleging violations of the First Amendment, Count II, alleging due process violations, Count III, alleging an unreasonable search and seizure, Count IV, alleging an invasion of privacy/due process, and Count VI, alleging liability under a custom or policy claim. In addition, Plaintiffs allege that Defendants violated the Maine Health-Care Decisions Act, 18-A M.R.S. § 5-801, Count V, and the Maine Constitution, Count VII. (*Id.* ¶¶ 98-111.) For relief, Plaintiffs request: (1) an order that Defendant

Mayhew turn over all Department records that relate to Paul Treworgy and the Treworgy family; (2) an order that Defendants provide Plaintiffs with a hearing on the merits of the Department's guardianship petition;  (3) restoration of Paul Treworgy's status as "a free United States citizen *nunc pro tunc,* rather than Ward of the State of Maine, as of the date of his death"; (4) an order that the County comply with the due process clauses of the United States Constitution and the Maine Constitution; (5) a declaration that the actions of Defendants were unlawful; (6) an award of compensatory and punitive damages; (7) an award of reasonable attorneys' fees, costs and interest; and (8) an award of all allowable penalties, and nominal and statutory damages.

## DISCUSSION

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may seek dismissal of "a claim for relief in any pleading" if that party believes that the pleading fails "to state a claim upon which relief can be granted."   In its assessment of Defendants' Motions, the Court must "assume the truth" of Plaintiffs' factual allegations and give Plaintiffs "the benefit of all reasonable inferences therefrom." *Blanco v. Bath Iron Works Corp.*, 802 F. Supp. 2d 215, 221 (D. Me. 2011) (quoting *Genzyme Corp. v. Fed. Ins. Co.,* 622 F.3d 62, 68 (1st Cir. 2010)).  To overcome the Motions, Plaintiffs must establish that their allegations raise a plausible basis for a fact finder to conclude that Defendants are legally responsible for the claims at issue. *Id.*

### B. Section 1983 Claims

Because Plaintiffs assert section 1983 claims against all of the Defendants, a review of the parameters of section 1983 will assist in the assessment of Defendants' motions.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. The State of Maine and its agencies are not "persons" within the meaning of section 1983 and, therefore, cannot be sued under section 1983. *Brown v. Newberger*, 291 F.3d 89, 92 (1st Cir. 2002) (citing *Will v. Mich. Dept. of State Police,* 491 U.S. 58, 71 (1989)). In this case, all of the named Defendants are "persons" susceptible to a section 1983 claim.

### 1. *Official Capacity Claims*

A party can pursue a claim against a state official in the official's official and personal capacities. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham,* 473 U.S. 159, 165 (1985). An official capacity claim is not treated as a claim against the official, but is considered a claim against the official's office. *Will*, 491 U.S. at 71. Under the Eleventh Amendment, recovery of retroactive monetary awards where payment would come from state coffers is barred.[3] *Consejo de Salud de la Comunidad de la Playa de Ponce, Inc. v. Gonzalez-Feliciano*, 695 F.3d 83, 103 (1st Cir. 2012), *cert. denied,* 134 S. Ct. 54 (2013). In an official capacity claim against a state office holder, therefore, a federal court may only award prospective injunctive relief against the office holder. *Hutto v. Finney*, 437 U.S. 678, 690 (1978) (citing *Ex parte Young,* 209 U.S. 123 (1908)). In an official capacity claim against a *municipal* office holder, however, both damages and injunctive relief may be recovered, provided "a municipal policy or custom caused the constitutional injury." *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*,

---

[3] "[T]he [Supreme] Court long ago held that the Eleventh Amendment bars a citizen from bringing suit against the citizen's own State in federal court, even though the express terms of the Amendment refer only to suits by citizens of another State." *Welch v. Texas Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 472 (1987). Prospective injunctive relief is not barred by the Eleventh Amendment based on the idea that "when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Virginia Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011).

507 U.S. 163, 166 (1993); *see also Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 131 S. Ct. 447, 449 (2010) (holding that the policy or custom requirements apply to claims for prospective injunctive relief as well as claims for money damages).

### *2. Personal Capacity Claims*

Unlike an official capacity claim, a "personal capacity" claim under section 1983 is not directed at the state office, but is asserted against the individual defendant personally.[4] *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The Eleventh Amendment is inapplicable to personal capacity claims because any award of damages on such a claim "can be executed only against the official's personal assets." *Id.* "[T]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166 (emphasis in original). An office holder is not vicariously liable for the actions of subordinates simply because of his or her supervisory authority. *Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 47 (1st Cir. 2012). Instead, a plaintiff must establish that the supervisory officer committed direct acts or omissions that resulted in the alleged deprivation, which conduct may include "supervisory encouragement, condonation or acquiescence, or gross negligence of the supervisor amounting to deliberate indifference." *Id.*

### C. Defendant Mayhew's Motion to Dismiss

Plaintiffs assert claims against Defendant Mayhew in both her official capacity and her personal capacity. Defendant Mayhew contends that she is entitled to dismissal of Plaintiffs' section 1983 claims because Plaintiffs do not allege a continuing violation for which prospective injunctive relief might be appropriate, and do not allege personal participation by Defendant

---

[4] "Personal capacity" claims are referred to, interchangeably, as "individual capacity" claims. *See, e.g., Lane v. Franks*, 134 S. Ct. 2369, 2383 (2014); *Goldstein v. Galvin*, 719 F.3d 16, 23 (1st Cir. 2013).

Mayhew in the purported wrongful acts. (Defendant Mayhew's Motion to Dismiss at 5, 9.) Additionally, Defendant Mayhew requests dismissal of the state law claims, citing Plaintiffs' failure to state a claim under either the Health-Care Decisions Act or the Maine Constitution. (*Id.* at 11-13.)

## 1. *The Section 1983 Claims against Defendant Mayhew*

In response to Defendant Mayhew's contention that injunctive relief is unavailable because Plaintiffs have not identified a continuing constitutional violation, Plaintiffs argue that "liberty and privacy rights were violated by Mayhew in the past and the ongoing concealment of the so-called 'evidence' used to commit these wrongs is a present violation of their due process rights." (Plaintiffs' Opposition to Defendant Mayhew's Motion at 2, ECF No.13.) Plaintiffs also maintain that they "have a fundamental right to know on what basis Paul Treworgy was made a ward of the State of Maine" (*id.* at 3), that the guardianship statute afforded them inadequate substantive and procedural protections, and that Defendant Mayhew abuses the guardianship statute on a regular basis (*id.* at 3-5).

### a. *Official capacity*

To determine whether Plaintiffs' official capacity claim can yield a remedy, the Court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002). As the Supreme Court has stated, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, … if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). Absent a present adverse effect, however, a claim for prospective injunctive relief ordinarily does not constitute an actual case or controversy. *Id.* at

493. In some cases, a plaintiff may seek to demonstrate the existence of a justiciable controversy warranting injunctive relief prohibiting certain official conduct from reoccurring in the future, but in such cases the plaintiff must allege a plausible basis for one to find or infer that the plaintiff is "realistically threatened by a repetition of his experience." *City of Los Angeles v. Lyons,* 461 U.S. 95, 109 (1983). However, "the capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *Id.* To state a claim, therefore, a plaintiff must allege a continuing adverse effect or a realistic threat that a past deprivation will be repeated.

Assuming, *arguendo*, that Paul Treworgy was placed under involuntary public guardianship in the absence of sufficient pre-deprivation procedure, because he subsequently passed away, Mr. Treworgy is no longer subject to a liberty deprivation, and he would not be subject to future guardianship proceedings. Because Mr. Treworgy is not threatened by a repeat of the process about which Plaintiffs complain, prospective injunctive relief with respect to the conduct of guardianship proceedings is not available.

Plaintiffs, however, also request that the Court "[r]estore the status of the late Paul F. Treworgy as a free United States citizen *nunc pro tunc*, rather than Ward of the State of Maine, as of the date of his death." (First Am. Compl., p. 16.) In other words, Plaintiffs seek to expunge or modify a public record. Because certain records can have a prospective effect, courts, including this Court, have permitted actions for injunctive relief to obtain an order expunging unconstitutional proceedings from state records. *See*, *e.g.*, *Gomes v. Univ. of Me. Sys.*, 304 F. Supp. 2d 117, 122 (D. Me. 2004). Here, affording Plaintiffs' factual allegations "the benefit of all reasonable inferences therefrom," *Blanco*, 802 F. Supp. 2d at 221, Plaintiffs allege that as the result of an unconstitutional proceeding, Mr. Treworgy became a "ward" of the State, which status has

11

an ongoing effect on the perception of Mr. Treworgy, his estate and his family.[5] Plaintiffs, therefore, have asserted a claim for which prospective injunctive relief could be available.[6]

    *b.    Personal capacity*

"It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999). A review of Plaintiffs' Complaint reveals that Plaintiffs have not asserted that Defendant Mayhew was personally involved in any of the decisions or other conduct about which Plaintiffs complain. Accordingly, Plaintiffs fail to state a plausible claim for relief against Defendant Mayhew in her personal capacity.

*2.    Maine Health-Care Decisions Act*

Defendant Mayhew maintains that the facts set forth in Plaintiffs' complaint do not and cannot support a claim under the Maine Health-Care Decisions Act (the Act). (Defendant Mayhew's Motion to Dismiss at 12.) Although the Act authorizes the recovery of statutory damages for certain defined violations, Plaintiffs have not asserted facts that would support a recovery. *See* 18-A M.R.S. § 5-810. Indeed, Plaintiffs do not argue otherwise.

*3.    Maine Constitution*

Defendant Mayhew argues that Plaintiffs' claim under the Maine Constitution should be dismissed because Plaintiffs make no reference in the First Amended Complaint to a claim under

---

[5] Plaintiffs complain in part of reputational injury combined with the deprivation of a liberty interest related to Mr. Treworgy's desire, and their desire, that Mr. Treworgy remain in the home and/or forego unwanted medical treatment. Reputational injury combined with an alteration of "a right or status previously recognized by state law" is "sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment." *Paul v. Davis*, 424 U.S. 693, 711 (1976). Plaintiffs' request for injunctive relief is arguably not limited to liberty interests held exclusively by Mr. Treworgy that have been lost as a consequence of his death.

[6] *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 n. 16 (1996) ("an individual may obtain injunctive relief under *Ex Parte Young* [articulating an exception to the Eleventh Amendment immunity] in order to remedy a state officer's ongoing violation of federal law.").

the Maine Civil Rights Act, 5 M.R.S. § 4682, which governs private causes of action based on constitutional violations. (Defendant Mayhew's Motion to Dismiss at 12-13.) A review of Plaintiffs' First Amended Complaint reveals that Plaintiffs have not specifically referenced the Maine Civil Rights Act. Instead, Plaintiffs rely upon the facts alleged in support of their federal claims. More particularly, Plaintiffs assert, "[t]he Defendants have violated rights afforded to the Plaintiffs under the State of Maine Constitution, including natural rights, speech, privacy, due process and the right to be free from unreasonable search and seizure." (First Amended Complaint ¶ 111.)

> The Maine Civil Rights Act provides a private right of action against:
>
> any person, whether or not acting under color of law, [who] intentionally interferes or attempts to intentionally interfere by physical force or violence against a person ... or by the threat of physical force or violence against a person ... with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the laws of the United States or of rights secured by the Constitution of Maine or laws of the State . . . .

5 M.R.S. § 4682(1–A). *See Doe v. Graham*, 2009 ME 88, ¶ 21, 977 A.2d 391, 398-99. The Maine Supreme Judicial Court has "decline[d] to expand the available remedies for a violation of rights guaranteed by the Maine Constitution beyond those which the Legislature in its wisdom has provided." *Andrews v. Dep't of Envtl. Prot.*, 1998 ME 198, ¶ 23, 716 A.2d 212, 220 (considering whether to recognize an implied cause of action for violation of the Maine Constitution, analogous to the federal cause recognized in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)).

Plaintiffs argue that their failure to make reference to the Maine Civil Rights Act is immaterial because they "clearly identified the analogous federal statute, 42 U.S.C. § 1983." (Plaintiffs' Opposition at 5.) They otherwise state that the "disposition of their [federal] claims will control claims asserted under the Maine Civil Rights Act." (*Id.*) While Plaintiffs do not

13

specifically reference the Maine Civil Rights Act, given that Plaintiffs plainly allege that Defendants violated the Maine Constitution, the failure to identify the Act as the authority to assert a civil action is not fatal to Plaintiffs' claim.

To the extent Plaintiffs seek to recover monetary damages as the result of an alleged violation of the Maine Constitution, Plaintiffs' claim is barred by the immunity afforded by the Eleventh Amendment to the United States Constitution. "A State does not waive Eleventh Amendment immunity in federal courts merely by waiving sovereign immunity in its own courts." *Welch v. Texas Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 473-74 (1987). That is, "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment … [T]his principle applies as well to state law claims brought into federal court under pendent jurisdiction." *Lopez v. Massachusetts*, 588 F.3d 69, 73 n.1 (1st Cir. 2009) (quoting *Pennhurst State Sch. & Hosp. v. Haldeman*, 465 U.S. 89, 121 (1984)).

Maine's Civil Rights Act, however, permits a private cause of action for equitable relief. 5 M.R.S. § 4682(1–A). As explained above, Plaintiffs have stated a claim for prospective injunctive relief. Plaintiffs thus have asserted a claim for equitable relief under the Maine Civil Rights Act.

### D. County Defendants' Motion to Dismiss

Plaintiffs' claims against the Penobscot County Commissioners and the Penobscot County Register of Probate constitute official capacity claims. (First Am. Compl. ¶¶ 6-7.) In their Motion to Dismiss, the County Defendants argue that Penobscot County "bears no responsibility for the consequences of judicial actions occurring in the probate court." (County Defendants' Motion to

Dismiss at 2, ECF No. 8.) Additionally, they argue that the Plaintiffs have not stated a claim for municipal liability. (*Id.* at 3.)

The Maine Probate Court "has exclusive jurisdiction over guardianship proceedings." 18-A M.R.S. § 5-102. Furthermore, "a[] probate judge is not a county officer." *Hart v. Cnty. of Sagadahoc*, 609 A.2d 282, 284 (Me. 1992) (citing 30-A M.R.S. § 1(2)).[7] Thus, although Penobscot County pays the salary of the Judge of Probate presiding in Penobscot County, Penobscot County has "no authority to exert control over the activities of the probate judge or the procedures of the probate court." *Id.* Ultimately, the authority to control procedure in probate court rests with the Maine Supreme Judicial Court. *See* 4 M.R.S. § 8 ("The Supreme Judicial Court has the power to prescribe, by general rules, for the Probate, District and Superior Courts of Maine, the forms of process, writs, pleadings and motions and the practice and procedure in civil actions at law.").[8]

The question generated by the County Defendants' motion is not whether Plaintiffs have alleged a deprivation of one or more of Plaintiffs' constitutional rights.[9] Instead, the question is whether, assuming such a deprivation, the County Defendants are proper defendants in this action and, if so, whether Plaintiffs have asserted facts that would support a claim against the County Defendants based on a custom or policy.

---

[7] "'County officers' means the commissioners, treasurer, sheriff, register of deeds and register of probate of a county." 30-A M.R.S. § 1(2).

[8] The Maine Rules of Probate Procedure include rules pertaining to notice and process. *See* Me. R. Prob. P. 4, 5. In addition, the Legislature has prescribed certain requirements respecting notice and procedure in guardianship proceedings. *See* 18-A M.R.S. § 5-303 ("Procedure for court appointment of a guardian of an incapacitated person"); *id.* § 5-310-A ("Temporary guardians"); *id.* § 5-309 ("Notices in guardianship proceedings").

[9] "[T]he timing and nature of [a due process] hearing will depend on appropriate accommodation of the competing interests involved. These include the importance of the private interest and the length or finality of the deprivation, the likelihood of governmental error, and the magnitude of the governmental interest involved." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 434 (1982) (quotation marks and citation omitted).

1. **The County Commissioners**

Contrary to Plaintiffs' assertion that the County Commissioners have control over the "procedure and manner in which justice is administered" (First Am. Compl. ¶ 88), as explained above, the Maine Supreme Judicial Court, not the County, is responsible for the procedure in the Probate Court. Because as a matter of law the County Commissioners have no role in the establishment of the procedures, rules or policies that governed the subject guardianship proceedings in the Probate Court, the County Commissioners are not legally responsible under any of the theories advanced by Plaintiffs.

2. **The Register of Probate**

A register of probate in Maine is chosen in a county-wide election. Me. Const. art. VI, § 6; 18-A M.R.S. § 1-501.[10] A register of probate is not a probate court "employee." 18-A M.R.S. § 1-510. The conduct of office, however, is subject to inspection by the judge of probate. *Id.* § 1-507. A register carries out duties similar to clerks of court. For example, the register is the custodian of probate records, and maintains the probate court's docket. *Id.* § 1-503. In fact, under the Maine Rules of Probate Procedure, a register of probate performs various clerk of court duties. Me. R. Prob. P. 4, 44, 55(a), 77(d), 79.

An initial question is whether a register of probate occupies a state office or a municipal office. The fact that a register of probate does not have final *policymaking* authority regarding probate proceedings might suggest that a register of probate should be considered to be a municipal defendant. *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 786 (1997). If, however, the register

---

[10] Article VI, section 6 was repealed by popular referendum, removing any "constitutional prohibition limiting the power of the Legislature to provide for the office of Register of Probate in such manner and on such terms as it may enact." *Opinion of the Justices*, 237 A.2d 400, 404 (Me. 1968). However, it remains the case today that registers of probate in Maine are elected officials and are not appointed by the judges of probate. 18-A M.R.S. § 1-501.

16

is considered to be an "agent" of the Probate Court or the Judge of Probate, *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978), Maine law suggests that an official capacity claim against the register may be the equivalent of a claim against a state office. Here, the County Defendants in fact maintain that the register is a county (i.e., municipal) officer. (County Defendants' Reply at 3-4.)[11] A central issue is thus whether Plaintiffs have alleged a claim that is based on conduct other than a judicial function.

In essence, Plaintiffs' claims against the Register consist of alleged due process violations arising from the Register's alleged (a) failure to provide Plaintiffs with notice and copies of pleadings timely, (b) failure to maintain a record of the temporary guardianship proceeding, and (c) failure to provide notice regarding the future course of proceedings. Given that Plaintiffs' claims focus at least in part on administrative functions, Plaintiffs' claims cannot be construed as claims based solely on judicial decisions.

Plaintiffs' allegations suggest the possibility of a local practice that is neither mandated by nor prohibited by state law. In this way, affording all reasonable inferences to Plaintiffs' complaint, Plaintiffs allege a practice performed by the Register in a municipal capacity. As a municipal officer capable of establishing such a local practice, conceivably, the Register can be liable, in her official capacity, under section 1983 for maintaining a "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690-91. In other words, the fact that the Register operates within a system of state law and procedure does not mean that she is incapable of establishing a local

---

[11] If the Register of Probate occupies a state office rather than a municipal office, the analysis of the official capacity claim against her would mirror the analysis of the claim against Defendant Mayhew. That is, there could be no recovery of money damages and the claim for prospective injunctive relief would proceed as outlined above. The analysis of municipal custom and policy would not apply because Plaintiffs have not included a personal capacity claim against the Register of Probate.

17

policy or custom. "[T]he power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell* contemplates that there are other officials 'whose acts or edicts may fairly be said to represent official policy,' . . . and whose decisions therefore may give rise to municipal liability under § 1983." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (citing *Monell,* 436 U.S. at 694). Paraphrasing *Blackburn v. Snow*, municipal liability arises "because the [Register] was the county official who was elected by the County's voters to act for them and to exercise the powers created by state law." 771 F.2d 556, 571 (1st Cir. 1985).

Although the County Defendants maintain that the Register, in her official capacity, has no responsibility for the consequences of judicial actions, the County Defendants, without a factual record on a motion to dismiss, cannot conclusively refute Plaintiffs' contention that the Register's office acted pursuant to a local practice within the meaning of a section 1983 claim. Plaintiffs, therefore, have stated an official capacity claim against the Register based on the alleged violation of due process.[12]

### 3.    State Law Claims

Although the County Defendants do not address the state law claims in their Motion to Dismiss, dismissal of Count V is appropriate because Plaintiffs have no claim against the County Defendants under the Maine Health-Care Decisions Act. As explained above, however, dismissal of Count VI is not warranted because Plaintiffs' failure to identify the Maine Civil Rights Act as the authority for their constitutional-based claim is not dispositive. Here, because Plaintiffs'

---

[12] Claims asserting municipal liability under section 1983 are not subject to a heightened pleading standard. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013). Rule 8(a)(2) simply requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs have provided such a short and plain statement. That statement raises a plausible claim to relief, beyond the realm of mere conjecture, which is all that is required. *Rodriguez-Reyes*, 711 F.3d at 53.

allegations can reasonably be construed to assert that the Register, while acting as a municipal officer, violated Plaintiffs' constitutional rights, Plaintiffs' request for an award of damages in the context of a state law claim is not barred by the Eleventh Amendment.

## CONCLUSION

Based on the foregoing analysis, the recommendation is that the Court grant in part and deny in part the County Defendants' Motion to Dismiss (ECF No. 8) as follows: (a) deny the County Defendants' Motion on Plaintiffs' section 1983 claims[13] against the Register in her official capacity, (b) deny the County Defendants' Motion on Plaintiffs' state law constitution-based claims against the Register, and (c) grant the County Defendants' Motion to Dismiss as to all of the other claims asserted against the County Defendants.[14]

The recommendation is also that the Court grant in part and deny in part Defendant Mayhew's Motion to Dismiss (ECF No. 11) as follows: (a) deny Defendant Mayhew's Motion on Plaintiffs' section 1983 and state law constitution-based claims for prospective injunctive relief, and (b) grant Defendant Mayhew's Motion to Dismiss as to all of the other claims asserted against Defendant Mayhew.[15]

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

---

[13] Plaintiffs' section 1983 claims are broken into four counts. Because Defendants' motions focus on whether they are proper defendants and do not challenge each of the constitutional theories asserted in counts I through IV, this Recommended Decision does not assess the merits of each individual theory.

[14] If the Court adopts the recommendation, the County Commissioners would be dismissed from the case.

[15] Neither motion challenges the claims against Ms. Ingraham.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 12th day of November, 2014.